[No. 9346.   *En Banc.*   May 8, 1911.]

Josh R. McIntyre, *Appellant*, v. E. W. Johnston *et al.*,
*Respondents.*[1]

Partnership—Accounting—Partnership Property — Evidence—
Sufficiency—Laches. In an action for a partnership accounting,
an indefinite agreement for partnership relations respecting the
operation of a boat to be owned equally by the parties, the hull of
which was furnished by plaintiff and the engines and principal
part of the expenses by the defendant, is not sufficient to create a
partnership in two other boats, thereafter acquired by the de-
fendant, in which the engines of the old boat were installed, where
it appears that the partnership operations had been discontinued
for a year, the plaintiff taking the hull of the old boat and the de-
fendant the engines, that the defendant used and exercised full
control over the new boats, and the plaintiff took the hull of the old
one, and later stored and did work for the defendant on the new
boats, charging defendant full value for such storage and service,
and made no claim to an interest therein for seven years.

Partnership—Accounting—Conditional Sale of Property—Title
—Evidence for Accounting—Sufficiency. A partnership account-
ing for a half interest in a mining claim, alleged to have been ac-
quired by defendant in a trade for a partnership boat, is properly
denied, where it appears that the partnership relations had been
discontinued, that the boat and claim were considered only of nom-
inal value, the claim being offered to defendant for $150, and that
he agreed to take the boat back and pay $150 in case the vendee
could not make it run, which defendant did long before the mining
claim was found to be of value; since the boat was only conditionally
sold, the title thereto did not pass, and it did not form the consid-
eration for the claim.

Appeal — Review — Trial — Findings—What Constitutes—Ne-
cessity of Exceptions. Where the trial court, in dismissing an
equitable action, refused to make specific findings of fact and con-
clusions of law, it is not necessary, in order to secure a review on
appeal, to take exceptions to an oral opinion rendered at some length,
which the court stated could be written out by the stenographer
and considered as findings, where it contained only informal state-
ments that did not cover the controversy.

Partnership—Accounting — Defenses — Laches. The lapse of
seven years, after the abandonment of a partnership, and the con-

[1]Reported in 115 Pac. 509.

tinued exclusive use for that time of some of the property by the
partner who had furnished most of the money, may be sufficient to
bar an action for an accounting by the other partner.

Appeal from a judgment of the superior court for King
county, Robert H. Lindsay, Esq., judge *pro tempore*, entered
October 13, 1910, upon findings in favor of the defendants,
after a trial on the merits before the court without a jury,
in an action for an accounting. Affirmed.

*Jay C. Allen* and *Blaine, Tucker & Hyland,* for appellant.

*Hughes, McMicken, Dovell & Ramsey,* for respondents.

PER CURIAM.—This is a suit for a partnership accounting.
It is prosecuted by the plaintiff upon the theory that there
was a partnership formed between him and the defendant
E. W. Johnston, in the year 1901, for the purpose of con-
ducting a towing business at Nome, Alaska, and that one of
the small boats constituting a part of the partnership prop-
erty was traded by Johnston for a certain placer mining claim
situated near Nome, in the summer of 1904, resulting in the
claim becoming the property of the partnership. While the
suit was for a general partnership accounting, there is, as we
understand the controversy, nothing here involved but the
right of the plaintiff to an accounting from the defendant for
a one-half interest in the claim, or rather the proceeds thereof.
From a decree denying the relief prayed for, the plaintiff has
appealed.

In the spring of 1901, appellant owned the hull of a small
boat at Tacoma, in which he proposed placing power, fitting
it for use as a tow boat at Nome. At that time he entered
into an arrangement with Johnston by which Johnston was
to furnish the means for installing the power in the boat,
consisting of two gasoline engines, and also means for the
transportation of the boat to Nome. By this arrangement
Johnston was also to furnish means for the transportation
of appellant and his family to Nome. Johnston was not to

be actively engaged in the operation of the boat, but its
operation was to be carried on by appellant, who was to be
paid a salary therefor from the earnings of the boat before the
division of any profits.    When the boat arrived at Nome
ready for its proposed use in the summer of 1901, Johnston
had advanced means towards the enterprise a great deal
more in amount than appellant had, and it was understood
that Johnston should be repaid the excess he had put into
the enterprise over what appellant had put in.    This excess
was first to be repaid to Johnston from the net earnings
of the boat, and thereafter the net earnings were to be
divided equally between appellant and Johnston, and each was
to be considered as owning equal shares in the boat.    This
understanding was not reduced to writing, and was loosely
entered into.    Some contention is made that the arrangement
then entered into did not in law amount to a partnership
agreement.    We will not attempt to solve that problem, nor
have we attempted to state what the understanding of the
parties was with any great degree of accuracy, but will as-
sume that they did then enter into partnership relations sub-
stantially upon the terms we have indicated.

Upon appellant's attempting to operate the boat at Nome
it proved to be practically worthless for the purpose intended,
and it was unable to earn anything of any consequence.    In-
deed, it is very doubtful as to whether or not it ever earned
sufficient to pay the expense of operation.    In July, 1901, the
boat ceased to be used in the partnership business, both ap-
pellant and Johnston assenting thereto.    Thereafter there was
acquired, at the expense of Johnston, two other small boats,
in each of which was placed one of the engines taken from
the first boat.    The installing of these engines was also done
at Johnston's expense.    The boats were given the names of
"Pup No. 1," and "Pup No. 2."    The earning power of
these boats proved no better than that of the first boat.    In
the fall of 1901, one of these boats was tied to a schooner
anchored at Nome, and during a storm the schooner was

obliged to put to sea, carrying the small boat with her. This small boat eventually fell into the hands of a United States marshal at Dutch Harbor and was sold. The following spring, 1902, Johnston recovered this boat at Dutch Harbor while on his way north from Seattle to Nome, put it on board ship, and carried it back to Nome. It might well be argued that the circumstances under which he recovered this boat resulted in its becoming his property, regardless of any partnership relations between him and appellant. In any event the recovery of the boat was accomplished at considerable expense and added to the amount of the investment Johnston had in the boats. Later one of these boats was burned on the beach some distance from Nome, and thereafter her engine was recovered by Johnston.

It seems clear that there was no pretense of carrying on the business contemplated by the partnership agreement after the summer of 1901, or in any event not after the summer of 1902. Johnston seems to have exercised entire control and ownership over the two Pup boats after that, and appellant seems to have exercised ownership over the hull of the first boat, at least it was stored close to his place of business at Nome, and was later sold by his representative there and no account made therefor to Johnston; neither has Johnston ever accounted to appellant for the Pup boats. There does not seem to have been any formal accounting of the partnership affairs nor any formal agreement for division of the partnership property. It seems highly probable from the record that Johnston has at all times had considerably more invested in the enterprise than appellant. In the fall of 1901, appellant appears to have been conducting a storage business at Nome, and he then received for storage from Johnston one dynamo and one box of tools, part of the apparel of one or the other of these Pup boats. He gave Johnston a receipt for these, indicating that he regarded them as Johnston's property. In the summer of 1902, appellant, with a partner, was conducting a machinery and storage business at

Nome under the name of Josh. R. McIntyre & Company. They then performed mechanical work upon one, or possibly both, of these Pup boats for which appellant collected from Johnston the entire amount charged therefor, amounting to $141.38, appellant receipting payment therefor in his own name. These are among the circumstances indicating the termination of partnership relations between appellant and Johnston, and that appellant regarded Johnston as the owner of the Pup boats.

In the summer of 1904, Johnston was offered the mining claim in question for $150. There is some controversy as to who offered the claim to Johnston, and as to who negotiated the deal with him by which he acquired title to the claim in the name of his wife. However this may be, it is plain that whoever Johnston made this deal with had the authority to do so, either as the owner or representative of the owners of the claim. Johnston testified to the bargain then made, relative to the consideration for the claim and the return of the boat, as follows:

"Q. At the time you made the trade of the Pup for the mining claim, or the interest in the mining claim, explain to the court the conditions under which the trade was made and what guarantee you had to give, if any, pertaining to the boat? A. They wanted $150 for the claim, and then we got talking about the boat, and I said, 'I will trade you the boat for the claim,' and they thought that they were not sure if they could make it run, and I said, 'If you want to make the deal you can, and if you cannot make the boat run, bring it back and I will give you $150 for it,' and a short time after, they came back and asked if I would stand by my bargain, and I said 'I have to, cannot you make it run' and they wanted to know if I would stand by my word, and Maynard tried it. That was sometime in the fall of 1904, and when I came in, in the spring of 1905 Maynard came to me, and said, 'I have that boat here' and I paid him $150 and took the boat. Q. Did you fulfill your guaranty to take the boat back if they could not make it operate? Did you give them $150? A. I did. Q. When did you give him the $150 for the boat back? A. Sometime in 1905, I think

in July or August.  Q. Before or after gold was struck on
this claim?  A. Long before."

At the time of acquiring the claim it was plain that neither
it nor the boat was regarded as of any more than nominal
value.  No gold had been taken from the claim nor was there
any prospect that there would be.  The boat had been little
else than a failure and was valued by Johnston and his wife
accordingly.  When the boat was taken back by Johnston
neither it nor the claim had any apparent different value
than at the time the deal was originally made.  This boat
has remained in Johnston's possession ever since he took it
back and paid the $150.  There was some effort to make it
appear that Johnston bought the boat back for use in his
business, without reference to any agreement he had made
to take it back at the time of acquiring the claim.  We think,
however, that the testimony of Johnston above quoted stands
practically uncontradicted.  At the time he took the boat and
paid the $150 there was no apparent reason for him seeking
to prevent the boat becoming the consideration for the claim.
Gold was not discovered upon the claim so as to render it of
apparently any greater value than when Johnston first ac-
quired it until long after the return of the boat.  We think
the record furnishes no reason for doubting that the boat was
conditionally traded for the claim, as testified to by Johnston.
We have given no attention to the question of the claim be-
ing Mrs. Johnston's separate property.  This suit was com-
menced in March, 1909, about seven years after the partner-
ship had ceased to do business, during all of which time no
accounting was made by either appellant or Johnston.

It seems clear to us that, so far as any accounting by
Johnston to appellant for the claim or the proceeds thereof
is concerned, the decree of the trial court must be sustained
upon the ground that the boat never became the consideration
for the claim, even assuming that the boat was partnership
property at the time of acquiring the claim.  The trade of
the boat for the claim was nothing more than a sale of the

boat upon trial or approval; and it having been returned in compliance with the original agreement, its title never passed from Johnston. The rule governing such a transaction is stated at 35 Cyc. 289, as follows:

"A sale on trial or approval is in the nature of an option to purchase the goods if they prove to be satisfactory, or a sale upon condition precedent, and its operation as regards the transfer of title is to be distinguished from what is commonly known as a sale or return. Where goods are sold on trial or approval or if satisfactory to the buyer the contract is executory, and the property in the goods does not pass until the buyer has expressly or impliedly manifested his approval or acceptance, unless a different intention appears; but acceptance and approval to pass title in the goods may be express, or may be implied from the conduct of the buyer, as by his failure to reject and return the goods."

In Benjamin on Sales (Bennett's 7th ed.), at p. 606, the rule is stated as follows:

"In sales on trial, or a delivery with a right to buy if one likes, the party has a reasonable time for trial, if none is expressly mentioned, and until that time, or the expiration of the limited time, the title and risk is in the vendor."

This doctrine is supported by abundant authority.

Some contention is made that we ought not to conclude that the title of the boat did not pass from Johnston, because the trial court found otherwise and no proper exception was taken to such finding. When the cause was submitted to the court after argument, the trial judge rendered an oral opinion of considerable length in which he reviewed the history of the relations of these parties in an informal manner. There were no specific findings of fact or conclusions of law stated separately. At that time counsel asked for findings to be made. This the judge declined to do, and at the conclusion of his oral opinion, stated that his remarks could be written out by the stenographer and filed in the case and considered as the findings. This was done later, and thereafter some

exceptions were taken thereto by respondents' counsel, which it is claimed were not taken within the statutory time. The nearest to a finding upon this question was an informal statement by the judge which was in keeping with the balance of his oral opinion, as follows:

"And then came the following really romantic somewhat strange circumstances that have happened for the last century in the mining camps of every western country—the trade for boat—the boat that was lying there worthless, a piece of junk, and Captain Johnston traded the boat for the mine. I do not think that Captain Johnston gave a single moment's thought to whether McIntyre had any interest in the boat or not. I don't think he cared. The man who had the mine said 'The mine is no good,' and Johnston said in reply, 'The boat is no good, so we are even so far as that is concerned.' But the trade was made. I presume Captain Johnston looked at the boat as a sort of hoodoo and was more than pleased to get rid of it. In the meantime McIntyre had left there and came down to Seattle. I think that McIntyre, when he came down here, gave up all thought of and absolutely abandoned—I do not know any better word to use in connection with it—absolutely abandoned any idea of claiming any interest whatever in any of that property."

We do not regard this as a specific finding of the nature of the contract entered into which resulted in the acquiring of the claim. It no way negatives the fact that this trade of the boat was conditional. Aside from this, we do not think that an informal opinion, rendered, as this was, in a case of purely equitable cognizance, calls for exceptions to statements made therein. Had there been formal findings of fact and conclusions of law covering the controversy, there might be some reason for contending that we ought not to look beyond the findings not excepted to. We therefore think it was immaterial as to whether or not exceptions were taken by counsel for respondent to the statements made in the court's opinion.

The trial court apparently denied the relief prayed for upon the ground that the partnership was abandoned about

1902, and that while there had been no formal settlement of the partnership business nor any specific agreement as to a division of the partnership property, the lapse of time since the abandonment of the partnership business and the assumption of ownership by Johnston of the Pup boats preclude a recovery by appellant. Since the decree denying the relief prayed for seems to us so clearly sustainable upon the ground that the boat never became the consideration for the claim, we deem it unnecessary to discuss other questions; though we think the ground upon which the trial court based its decision is also sufficient to prevent appellant's recovery. The decree is affirmed.